IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Abingdon Division

| | |
|---|---|
| JAMES WOOD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:22cv18 |
| ) | |
| BRISTOL VIRGINIA UTILITY ) | |
| AUTHORITY, ) | JURY TRIAL DEMANDED |
| ) | |
| Serve: ) | |
| Chair, Mr. Richard "Dickie" Kiser ) | |
| 15022 Lee Highway ) | |
| Bristol, VA 24202 ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

COMES NOW, the Plaintiff, James Wood ("Plaintiff" or "Mr. Wood") and brings this action against Defendant, Bristol Virginia Utility Authority ("Defendant" or "BVU"), seeking the relief set forth below. In support of this Complaint, Plaintiff states the following:

### JURISDICTION

1. This Court has jurisdiction over this matter as it arises from the federal questions presented by the Family and Medical Leave Act, as codified under Title 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), and the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq.*, and the ADA Amendments Act of 2008 ("ADA"). *See generally* 28 U.S.C. § 1331.

2. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims based in Virginia state law, including the Fraud and Abuse Whistle Blower Protection Act.

1

3. Mr. Wood is a citizen of the United States and is domiciled in Bristol, Tennessee.

4. BVU is a political subdivision of the Commonwealth of Virginia, established under Code § 15.2-7200, *et seq.*, to provide public utility services in certain counties of Virginia and Tennessee. BVU's principal place of business is in Bristol, Virginia.

5. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission on January 5, 2022; received a notice of right to sue dated February 4, 2022 (Exhibit A); and commenced this action within 90 days of receipt thereof.

**FACTS**

6. In June 2016, Wood was hired by BVU as a GIS/Engineering Technician. His job was to provide engineering support to the Electrical & Water/Wastewater Departments and maintain the Geographic Information Systems ("GIS").

7. At all times during his employment, Mr. Wood exhibited exceptional work performance and could fulfill the essential functions of his job.

8. At all times relevant, Don Bowman was BVU's CEO.

9. At all times relevant, Phillip King, Water & Wastewater and GIS Manager, was Mr. Wood's immediate supervisor.

10. At all times relevant, Donna Briggs was the Human Resources Manager.

11. Throughout Mr. Wood's employment, Mr. Wood observed that BVU management retaliates against employees who report safety issues or violations of laws.

12. For example, in June 2016, Mr. Wood reported to Mr. Bowman that a transformer oil spill was not properly dealt with. In retaliation, Mr. King sent Mr. Wood out in the field to "play in sewage" with no protective gear. Mr. Wood reported the

harassment to Mr. Bowman, who harangued Mr. Wood, discouraging him from reporting future safety issues or violations. For weeks after the incident, Mr. King required Mr. Wood to report to him when he left and returned from lunch. The following month, Mr. Wood was demoted from a salaried employee to an hourly employee.

13. Mr. Wood has also observed that BVU management disfavors and discriminates against employees who require medical or sick leave.

14. This well-known retaliatory track-record perpetuated additional regulatory violations during the onset of COVID-19, when neither management nor employees complied with regulations promulgated by the Virginia Department of Labor and Industry intended to safeguard workers from unnecessary infection.

15. BVU's discriminatory animus towards employees requiring medical or sick leave broadened during the COVID-19 pandemic to include employees required to quarantine, causing BVU employees to avoid quarantine and flout regulations designed to protect them from infection.

16. At all times relevant 16 VAC 25-220-40 was in effect.

17. Under 16 VAC 25-220-40(B)(5), "[e]mployers shall not permit suspected or confirmed COVID-19 employees or other persons to report to or remain at the work site or engage in work at a customer or client location until cleared for return to work."

18. Under 16 VAC 25-220-40(C)(1), (3), "[i]f the employer knows an employee is COVID-19 positive . . . then the employer must immediately remove that employee from the work site and keep the employee removed until they meet the return to work criteria . . . in accordance with guidance from a licensed health care provider, a VDH public health professional, or CDC's 'Isolation Guidance' . . . and CDC's 'Return to Work Healthcare Guidance.'"

19.     Under 16 VAC 25-220-40(C)(2), (3), "[i]f the employer knows an employee is suspected COVID-19 . . . the employer must immediately remove that employee from the work site and either [test the employee] or [k]eep the employee removed until they meet the return to work criteria . . . in accordance with guidance from a licensed health care provider, a VDH public health professional, or CDC's 'Isolation Guidance' . . . and CDC's 'Return to Work Healthcare Guidance.'"

20.     Under 16 VAC 25-220-40(B)(7), "employers shall establish a system to receive reports of positive COVID-19 tests by employees, . . . present at the place of employment within two days prior to symptom onset (or positive test if the employee is asymptomatic) until 10 days after onset (or positive test)."

21.     Upon receiving such a report, "Employers shall notify . . . employer's own employees who may have been exposed, within 24 hours of discovery of the employees' possible exposure . . . [and] [t]he Virginia Department of Health . . . when the work site has had two or more confirmed cases of COVID-19 of its own employees present at the place of employment within a 14-day period testing positive for COVID-19 during that 14-day time period . . . [and] [t]he Virginia Department of Labor and Industry within 24 hours of the discovery of two or more of its own employees present at the place of employment within a 14-day period testing positive for COVID-19 during that 14-day time period." 16 VAC 25-220-40(B)(7).

22.     Despite federal and state guidance and regulations providing otherwise, BVU encouraged COVID-19 positive employees to come to the workplace, placing other employees at great risk.

23. Employees, fearful that they would be terminated for following Virginia regulations and CDC guidelines, felt compelled to return to work despite their COVID-19 symptoms and the risk of exposing others.

24. Mr. Wood's coworker, "JP,"[1] tested positive for COVID-19 in March 2021.

25. Because of the well-known policy of BVU management retaliating against employees using sick leave, JP reported to work, knowing that he had COVID-19 and could infect others.

26. At least three other employees, known to have immediate family members with COVID-19, were encouraged to come to work, upon information and belief without even being tested for COVID-19, so long as they did not exhibit symptoms.

27. On March 30, 2021, Mr. Wood tested positive for COVID.

28. In accordance with the regulations, Mr. Wood notified Brad Griswold, BVU's safety manager that JP had been coming to work for a week, while testing positive with COVID-19. Mr. Wood also reported his positive test.

29. On April 3, 2021, Mr. Wood received a case isolation letter from the Sullivan County Health Department, directing him to quarantine in accordance with State regulations and CDC guidelines.

30. The following week, Mr. Wood was hospitalized for four days with respiratory failure and sepsis.

31. Mr. Wood's infection resulted in a severe case of COVID-19 which caused him to develop lifelong disabilities, often described as "Long COVID," a recognized disability under the ADA.

---

[1] JP is an anacronym that has been used to protect the privacy of the coworker.

32. Specifically, Mr. Wood's lungs are irrevocably damaged. He suffers from shortness of breath, necessitating the use of oxygen, and fatigue and is substantially limited in respiratory function, a major bodily function.

33. On April 14, 2021, Mr. Wood applied for FMLA leave.

34. Mr. Wood remained out of work until April 26, 2021, when he received a work release for a limited 20 hour per week schedule, which Dr. James Schrenker determined would be "medically necessary" until May 10, 2021.

35. Upon his return to work, Mr. King, Water & Wastewater and GIS Manager, rejected Mr. Wood's temporary reduced work schedule contained in his medical release documents and FMLA paperwork.

36. Ms. Biggs, Human Resources Manager, asked Mr. Wood to share his FMLA paperwork with CEO Bowman and Mr. King, and the two men requested Mr. Wood's physician make significant changes to his recommendations, namely that the note must be changed to reflect that the diagnosis was Long COVID, must state exactly how many hours Mr. Wood could work each day, must state exactly how many hours Mr. Wood could work in total per week, must state that Mr. Wood must have one complete day off during the week to rest, must state that Mr. Wood will need oxygen while at work, and must state exactly which job functions Mr. Wood was and was not able to perform based on the job description. Mr. Wood was informed that he was required to ensure that his physician made these changes within the time allotted, or he would be terminated from employment.

37. BVU also required that Mr. Wood's physician fill out an additional form, which required a line-by-line description of Mr. Wood's alleged job functions with corresponding "yes" and "no" boxes, in order for Mr. Wood to be eligible for FMLA leave.

38. At the time Mr. Wood applied for FMLA leave, Ms. Biggs explained that he could either use his sick days and receive a full paycheck during his time out, or keep his sick time for use later, and take unpaid leave. Mr. Wood chose to reserve his sick time.

39. On April 28, 2021, three days after he was released for work on a limited schedule and still requiring oxygen, Mr. Wood was called to BVU Human Resources and was informed that Mr. King believed his work productivity was "poor."  He was given a negative performance evaluation.

40. At a meeting on April 29, 2021, Ms. Biggs and Lisa Dorbvic, Accountant, explained to Mr. Wood how much pay he would receive during his medical leave, and how much sick time he would be able to retain.

41. On April 30, 2021, CEO Bowman then unilaterally determined that Mr. Wood would have to use all his sick time, prior to being eligible for FMLA leave.

42. On May 9, 2021, Mr. Wood was diagnosed with a second case of COVID-19.

43. On May 10, 2021, Mr. Wood was directed by the Sullivan County Health Department to quarantine for 10 days.

44. Mr. Wood applied for FMLA leave again in order to quarantine and recover.

45. CEO Bowman rejected Mr. Wood's FMLA paperwork because he claimed that Mr. Wood's medical diagnosis was too vague.

46. Around that same time, Mr. Wood reported to BVU Human Resources that the rejection of his medical leave request was due to the hostile work environment created and maintained by BVU against those with disabilities and those who require medical or sick leave.

47. With his direct supervisor, the HR Manager, and the CEO denying his request for FMLA, Mr. Wood reached out to Danny Griffin, a member of the BVU Board

of Directors, on May 14, 2021. Mr. Wood reported to Mr. Griffin that he was "getting the run around with his FMLA paperwork" and that the "hostile environment needs to stop." Mr. Wood requested the opportunity to talk with the Board. Mr. Griffin responded that there was a Board meeting scheduled for May 21, 2021.

48. On May 20, 2021, Mr. Wood's physician faxed a medical note to BVU asking for Mr. Wood to be excused from work through May 28, 2021.

49. In the FMLA form submitted by Mr. Wood thereafter on May 21, 2021, Dr. James Schrenker noted that Mr. Wood "has had COVID twice [and was] still having cognition [and] endurance issues." The paperwork noted a referral to a pulmonologist for Mr. Wood's lung damage and stated that it was "medically necessary for [Mr. Wood] to work a reduced schedule" of 32 hours per week upon his return to work on May 28 until June 14, 2021. Dr. Schrenker further stated that "it will be medically necessary for [Mr. Wood] to be absent from work on an intermittent basis," noting that Mr. Wood could experience "episodes of incapacity" lasting between two and eight hours, which are estimated to occur 3-4 times per week for the next six months. Despite these limitations, Dr. Schrenker concluded that Mr. Wood "is able to perform all job functions but may require more time to complete tasks and work shorter days or weeks."

50. On May 27, 2021, Mr. Wood contacted Ms. Biggs and requested that he be able to use supplemental oxygen at work.

51. On May 28, 2021, Mr. Wood filed an OSHA whistleblower complaint setting forth that he was harassed and retaliated against for reporting JP coming to work while infected, his own positive COVID test, and the severe illness that followed.

52. That same day, on May 28, 2021, when Mr. Wood was to return to work on a modified work schedule, still while protected by intermittent FMLA leave, Mr. Bowman terminated Mr. Wood's employment by email.

## COUNT I: CLAIM FOR DISCRIMINATION AND RETALIATION IN VIOLATION OF THE FMLA

53. Mr. Wood incorporates by reference the preceding paragraphs of this Complaint.

54. BVU is (1) engaged in commerce and/or in an industry affecting commerce; and (2) an employer of fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year.

55. Mr. Wood worked for BVU for nearly five (5) years and worked more than 1,250 hours during the twelve (12) month period immediately preceding his request for FMLA leave.

56. Mr. Wood properly notified BVU of his disability/serious health condition, and of his need for FMLA-qualifying leave, to which he was entitled, when he requested and then submitted FMLA paperwork on or about April 14, 2021, and May 21, 2021.

57. BVU discriminated against Mr. Wood by improperly denying his federally protected FMLA rights, retaliating against him for attempting to exercise the substantive FMLA rights to which he was entitled, and terminating his employment.

58. BVU would not have terminated Mr. Wood's employment but for his requests related to, and use of, FMLA leave.

59. Any reasons given by BVU for its decision to terminate Mr. Wood's employment were pretextual as his work performance was excellent and Mr. Wood could

perform his job, with reasonable accommodation that would not cause an undue hardship to BVU, at the time of the termination of his employment.

60. BVU's discriminatory and retaliatory conduct prejudiced Mr. Wood in that he lost compensation and benefits, sustained other monetary losses, and suffered the loss of his employment as a direct result of BVU's violation.

61. As a direct and proximate result of BVU's actions, Mr. Wood has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

62. At all times material hereto, BVU engaged in unlawful or discriminatory practices with bad faith, malice or reckless indifference to the federally protected rights of Mr. Wood so as to support an award of liquidated damages.

63. The above-described acts by BVU and employees of BVU constituted unlawful discrimination and/or retaliation in violation of the Family Medical Leave Act, as codified under Title 29 of the United States Code §§ 2601 *et seq*. ("FMLA").

### COUNT II: CLAIM FOR INTERFERENCE WITH FMLA RIGHTS

64. Mr. Wood incorporates by reference the preceding paragraphs of this Complaint.

65. BVU is (1) engaged in commerce and/or in an industry affecting commerce; and (2) an employer of fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year.

66. Mr. Wood worked for BVU for nearly five (5) years and worked more than 1,250 hours during the twelve (12) month period immediately preceding his request for FMLA leave.

67. Mr. Wood properly notified BVU of his disability/serious health condition, and of his need for FMLA-qualifying leave, to which he was entitled, when he requested and then submitted FMLA paperwork on or about April 14, 2021, and May 21, 2021.

68. BVU interfered with Mr. Wood's use of FMLA leave by treating him differently and less favorably, than similarly situated employees not exercising FMLA rights, thus impeding Mr. Wood's exercise of his FMLA rights, and terminating his employment.

69. BVU terminated Mr. Wood's employment while he was on intermittent FMLA leave.

70. BVU's interference prejudiced Mr. Wood in that he lost compensation and benefits, sustained other monetary losses, and suffered the loss of his employment as a direct result of BVU's violation.

71. As a direct and proximate result of BVU's actions, Mr. Wood has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

72. At all times material hereto, BVU engaged in unlawful or discriminatory practices with bad faith, malice, or reckless indifference to the federally protected rights of Mr. Wood so as to support an award of liquidated damages.

73. The above-described acts by BVU and employees of BVU constitute unlawful interference with Mr. Wood's rights in violation of the Family Medical Leave Act, as codified under Title 29 of the United States Code §§ 2601 *et seq* ("FMLA").

## COUNT III: CLAIM FOR DISCRIMINATION
## AND RETALIATION IN VIOLATION OF THE ADA

74. Mr. Wood incorporates by reference the preceding paragraphs of this Complaint.

75. At all times relevant to this Complaint, Mr. Wood was a qualified individual with a disability, pursuant to the ADA.

76. Specifically, and at all times relevant, Mr. Wood suffered from a disability/serious health condition, namely Long COVID, a recognized disability under the ADA that impaired Mr. Wood's respiratory function, a major bodily function.

77. BVU became aware of Mr. Wood's disability/serious health condition when he was hospitalized with COVID-19 in early April 2021, and when he requested and then submitted FMLA paperwork which included medical restrictions on or about April 14, 2021, and May 21, 2021, and finally, when he requested permission to bring oxygen supplies to work on May 27, 2021.

78. Upon his return to work in late April 2021, Donna Biggs, Human Resources Manager, suggested to Mr. Wood that he "take a look at the American with Disabilities website," or words to that effect.

79. At all times relevant, Mr. Wood could perform the essential functions of his job as GIS/Engineering Technician with or without an accommodation.

80. BVU discriminated and retaliated against Mr. Wood by giving him a negative performance evaluation only three days after his return from medical leave on a reduced schedule.

81. BVU discriminated and retaliated against Mr. Wood by terminating his employment.

82. BVU would not have discriminated and retaliated against Mr. Wood but for his disability/serious health condition.

83. Any reasons given by BVU for its treatment of Mr. Wood were pretextual, as Mr. Wood's work performance was excellent.

84. Mr. Wood's negative performance review and termination from employment occurred close in time to his request for accommodation, raising a reasonable inference of unlawful discrimination and retaliation based upon his disability/serious health condition and/or request for accommodation.

85. As a direct and proximate result of BVU's actions, Mr. Wood has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

86. At all times material hereto, BVU engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Wood so as to support an award of punitive damages.

87. The above-described acts by BVU and employees of BVU constitute disability discrimination and retaliation in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq.*, and the ADA Amendments Act of 2008 ("ADA").

### COUNT IV: CLAIM FOR FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA

88. Mr. Wood incorporates by reference the preceding paragraphs of this Complaint.

89. At all times relevant to this Complaint, Mr. Wood was a qualified individual with a disability, pursuant to the ADA.

90. Specifically, and at all times relevant, Mr. Wood suffered from a disability/serious health condition, namely Long COVID, a recognized disability under the ADA that impaired Mr. Wood's respiratory function, a major bodily function.

91. At all times relevant, however, Mr. Wood could perform the essential functions of his job as GIS/Engineering Technician with or without an accommodation.

92. Mr. Wood requested reasonable accommodations in his physician's medical notes submitted on or about April 14, 2021, and May 21, 2021, and when he requested permission to bring oxygen supplies to work on May 27, 2021.

93. BVU failed to accommodate Mr. Wood's disability/serious health condition and terminated his employment instead.

94. As a direct and proximate result of BVU's actions, Mr. Wood has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

95. At all times material hereto, BVU engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Mr. Wood so as to support an award of punitive damages.

96. The above-described acts by BVU and employees of BVU constitute failure to accommodate in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq.*, and the ADA Amendments Act of 2008 ("ADA").

### COUNT V: TERMINATING WOOD'S EMPLOYMENT IN VIOLATION OF VA. CODE SEC. 40.1-27.3

97. Mr. Wood incorporates by reference the preceding paragraphs of this Complaint.

98. Va. Code § 40.1-27.3(A)(1) states that "[a]n employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee: . . . [r]eports a violation of any federal or state law or regulation to a supervisor or to any governmental body[.]"

99. When, on or about March 30, 2021, Mr. Wood reported the fact that JP came to work when he was infected with COVID-19 to Mr. Griswold, he was reporting a violation of 16 VAC 25-220-40, to a supervisor.

100. When, on or about May 28, 2021, Mr. Wood filed an OSHA complaint, he was reporting a violation of 16 VAC 25-220-40, to a governmental body.

101. Less than one-month after his initial complaint to Mr. Griswold, Mr. Wood received an unfounded negative performance review. Then, only one month later, and on the same day he filed his OSHA complaint, BVU terminated Mr. Wood's employment in retaliation for his report of the violation of 16 VAC 25-220-40.

102. Mr. Wood was adequately performing his job at the time of his termination of employment and any other reason offered by BVU for his termination is pretextual.

103. Mr. Wood's termination violated Va. Code § 40.1-27.3.

104. As a direct result and proximate result of the termination of his employment, Mr. Wood has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, harm to professional reputation, and other non-pecuniary losses.

105. Pursuant to Virginia Code § 40.1-27.3, Mr. Wood is entitled to "(i) an injunction to restrain continued violation of this section, (ii) the reinstatement of the employee to the same position held before the retaliatory action or to an equivalent

position, and (iii) compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs."

## COUNT VI: TERMINATING WOOD'S EMPLOYMENT IN VIOLATION OF VA. CODE § 2.2-3011

106. Mr. Wood incorporates by reference the previous paragraphs of this Complaint.

107. As an employee of BVU, Mr. Wood was an "employee" as that term is defined by the Fraud and Abuse Whistle Blower Protection Act. *See* Va. Code § 2.2-3009, *et seq*.

108. When Mr. Wood reported the fact that JP came to work when he was infected with COVID-19 to Mr. Griswold, he was reporting a violation of 16 VAC 25-220-40, "to one of [his] superiors." *See* Va. Code § 2.2-3010.

109. When Mr. Wood filed an OSHA complaint on May 28, 2021, he was reporting a violation of 16 VAC 25-220-40, to an "organization having jurisdiction over . . . regulatory violations." *See* Va. Code § 2.2-3010.

110. Mr. Wood is a "whistleblower" as that term is defined by the Fraud and Abuse Whistle Blower Protection Act. *See* Va. Code § 2.2-3009, *et seq*.

111. Va. Code § 2.2-3011(A) states that an "employer may [not] discharge, threaten, or otherwise discriminate or retaliate against a whistle blower."

112. Mr. Wood was adequately performing his job at the time of his termination of employment and any other reason offered by BVU is pretextual.

113. Mr. Wood's termination violated Va. Code § 2.2-3011.

114. As a direct result and proximate result of the termination of his employment, Mr. Wood has suffered and will continue to suffer pecuniary loss, emotional

16

pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, harm to professional reputation, and other non-pecuniary losses.

115.   Pursuant to Va. Code § 2.2-3011(D), Mr. Wood is entitled to "(i) reinstatement to the same position or, if the position is filled, to an equivalent position; (ii) back pay; (iii) full reinstatement of fringe benefits and seniority rights; or (iv) any combination of these remedies. The whistle-blower may be entitled to recover reasonable attorney fees and costs."

WHEREFORE, Plaintiff James Wood, demands judgment against Defendant Bristol Virginia Utility Authority; for equitable relief, injunctive relief, reinstatement of Mr. Wood to the same position he held before the retaliatory and discriminatory termination or to an equivalent position; compensation for lost wages, benefits, and other remuneration, full reinstatement of fringe benefits and seniority rights, emotional pain and suffering and loss of reputation damages, liquidated damages, punitive damages, together with interest thereon, as well as reasonable attorneys' fees and costs; and for such other and further relief as justice may require.

Trial by jury is demanded.

Respectfully submitted,

**JAMES WOOD**

By /s Thomas E. Strelka

Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
Brittany M. Haddox, Esq. (VSB # 86416)
Monica L. Mroz, Esq. (VSB #65766)
STRELKA EMPLOYMENT LAW
Warehouse Row

>119 Norfolk Avenue, S.W., Suite 330
>Roanoke, VA  24011
>Tel:  540-283-0802
>brittany@strelkalaw.com
>thomas@strelkalaw.com
>leigh@strelkalaw.com
>winston@strelkalaw.com
>monica@strelkalaw.com
>
>*Counsel for Plaintiff*