**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Abingdon Division**

| | |
|---|---|
| **JAMES WOOD,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:22-cv-18 |
| ) | |
| **BRISTOL VIRGINIA UTILITY** ) | |
| **AUTHORITY,** ) | |
| ) | |
| ) | |
| Defendant. ) | |

**<u>PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS FOR LACK OF
SUBJECT MATTER JURSIDICTION</u>**

COMES NOW, the Plaintiff, James Wood ("Plaintiff" or "Mr. Wood") and hereby presents this brief in opposition to Defendant, Bristol Virginia Utility Authority ("Defendant" or "BVU")'s motion to dismiss for lack of subject matter jurisdiction. For the reasons stated below, Defendant's motion should be denied.

## I.  Introduction

This matter arises from a former employment relationship between the parties. BVU is a political subdivision of the Commonwealth of Virginia, established under Code § 15.2-7200, *et seq.*, to provide public utility services

1

in certain counties of Virginia and Tennessee. BVU's principal place of business is in Bristol, Virginia.

Mr. Wood was formerly employed as a GIS/Engineering Technician for BVU. After his termination in May of 2021, Ms. Wood has advanced claims against BVU pursuant to the Family Medical Leave Act ("FMLA", Counts I and II), the Americans with Disabilities Act ("ADA", Counts III and IV), and two state statutory claims: Virginia Code § 40.1-27.3 ("Whistleblower Act", Count V) and Virginia Code § 2.2-3009 *et seq.* ("Fraud and Abuse Act", Count VI). In his filed complaint, Mr. Wood has claimed that the Court has federal question jurisdiction over the federal claims and supplemental jurisdiction regarding the state law claims.

BVU has filed a motion to dismiss predicated on an alleged lack of subject matter jurisdiction. As discussed below, BVU has only cited authority regarding the subject of sovereign immunity as applied to tort claims and Mr. Wood's FMLA claims. BVU has seemingly cited no authority for the proposition that it is immune from Mr. Wood's ADA claims, his claims under the Whistleblower Act, nor his claims under the Fraud and Abuse Act.

## II.  Standard of Review: Subject Matter Jurisdiction

A party may file a motion to dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1). If a court finds that it does not

have subject-matter jurisdiction over the case or controversy, it must dismiss the action. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006). The plaintiff bears the burden of establishing that federal jurisdiction is proper by a preponderance of the evidence. *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009); *see also Garrett v. Clarke*, 552 F. Supp. 3d 539, 548-49 (E.D. Va. 2021).

Challenges to subject-matter jurisdiction may be made in two ways. First, a factual challenge to jurisdiction can be made under the theory that the complaint's assertion of subject-matter jurisdiction is not true. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). In that event, a court may consider evidence outside the pleadings and decide disputed issues of fact. *Id*. Second, as here, a facial challenge may be made by arguing that the complaint does not allege facts that permit the exercise of federal subject-matter jurisdiction. *Id*. If that type of challenge is raised, "the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Id*. (*quoting Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).

At the motion to dismiss stage, pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must determine whether sufficient facts have been pled in order to state a plausible claim for relief. *See Ashcroft v. Iqbal*,

556 U.S. 662, 679 (2009) (*citing Bell Atl. Corp v. Twombly*, 550 U.S. 544 (2007)). The Court need only look at the four corners of the complaint to determine sufficiency of the facts alleged, rather than "resolve contests surrounding the facts, merits of a claim, or the applicability of defenses." *Republican Party of N. Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

Thus, the proper inquiry is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The court must accept all of the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999).

### III. Summary of Pertinent Alleged Facts

In June 2016, Mr. Wood was hired by BVU as a GIS/Engineering Technician. (¶6 of filed Complaint, Dkt. No. 1). At all times during his employment, Mr. Wood exhibited exceptional work performance and could fulfill the essential functions of his job. (¶7). Throughout Mr. Wood's employment, Mr. Wood observed that BVU management retaliates against employees who report safety issues or violations of laws. (¶11). Mr. Wood

also observed that BVU management disfavors and discriminates against employees who require medical or sick leave. (¶13).

### A. BVU Disfavors COVID-19 Safety Measures and Employees with Disabilities In Need of Medical Leave

As alleged by Mr. Wood, during the onset of the COVID-19 pandemic neither management nor employees complied with regulations promulgated by the Virginia Department of Labor and Industry intended to safeguard workers from unnecessary infection. (¶14). BVU's discriminatory animus towards employees requiring medical or sick leave broadened during the COVID-19 pandemic to include employees required to quarantine, causing BVU employees to avoid quarantine and flout regulations designed to protect them from infection. (¶15). Mr. Wood cited state regulations regarding maintaining safe working environments that were not followed at BVU. (¶¶16-21). Employees, fearful that they would be terminated for following Virginia regulations and CDC guidelines, felt compelled to return to work despite their COVID-19 symptoms and the risk of exposing others. (¶23).

Mr. Wood recounted how the working environment permitted a labor force that included COVID-19-positive employees. (¶¶24-26). Unfortunately, Mr. Wood also tested positive for COVID-19. (¶27). Mr. Wood's infection resulted in a severe case of COVID-19 which caused him to develop lifelong disabilities, often described as "Long COVID," a recognized disability under

5

the ADA. (¶31). On April 14, 2021, Mr. Wood applied for FMLA leave. (¶33). Mr. Wood remained out of work until April 26, 2021, when he received a work release for a limited 20 hour per week schedule, which his health care provider determined would be "medically necessary" until May 10, 2021. (¶34).

### B. BVU Management Does Not Accept Mr. Wood's Medical Documentation

Upon his return to work, Mr. King, Water & Wastewater and GIS Manager, rejected Mr. Wood's temporary reduced work schedule contained in his medical release documents and FMLA paperwork. (¶35). BVU management asked Mr. Wood to make significant changes to his physician's recommendations. Mr. Wood was informed that he was required to ensure that his physician made specific and particularized changes within the time allotted, or he would be terminated from employment. (¶36).

On April 28, 2021, three days after he was released for work on a limited schedule and still requiring oxygen, Mr. Wood was called to BVU Human Resources and was informed that management believed his work productivity was "poor." He was given a negative performance evaluation. (¶39). On April 30, 2021, the BVU CEO determined that Mr. Wood would have to use all his sick time, prior to being eligible for FMLA leave. (¶41).

### C. Second Onset of COVID-19; Second Use of FMLA; Termination

On May 9, 2021, Mr. Wood was diagnosed with a second case of COVID-19. On May 10, 2021, Mr. Wood was directed by the Sullivan County Health Department to quarantine for 10 days. Mr. Wood applied for FMLA leave again in order to quarantine and recover. BVU rejected Mr. Wood's FMLA paperwork because he claimed that Mr. Wood's medical diagnosis was too vague. (¶¶42-45). Mr. Wood subsequently reported to BVU Human Resources that the rejection of his medical leave request was due to the hostile work environment created and maintained by BVU against those with disabilities and those who require medical or sick leave. (¶46).

On May 20, 2021, Mr. Wood's physician faxed a medical note to BVU asking for Mr. Wood to be excused from work through May 28, 2021. (¶48). In the FMLA form submitted by Mr. Wood thereafter on May 21, 2021, Dr. James Schrenker noted that Mr. Wood "has had COVID twice [and was] still having cognition [and] endurance issues." The paperwork noted a referral to a pulmonologist for Mr. Wood's lung damage and stated that it was "medically necessary for [Mr. Wood] to work a reduced schedule" of 32 hours per week upon his return to work on May 28 until June 14, 2021. Dr. Schrenker further stated that "it will be medically necessary for [Mr. Wood] to be absent from work on an intermittent basis," noting that Mr. Wood could

7

experience "episodes of incapacity" lasting between two and eight hours, which are estimated to occur 3-4 times per week for the next six months. Despite these limitations, Dr. Schrenker concluded that Mr. Wood "is able to perform all job functions but may require more time to complete tasks and work shorter days or weeks." (¶49).

On May 27, 2021, Mr. Wood contacted Ms. Biggs and requested that he be able to use supplemental oxygen at work. (¶50). On May 28, 2021, Mr. Wood filed an OSHA whistleblower complaint setting forth that he was harassed and retaliated against for reporting a co-worker coming to work while infected, his own positive COVID test, and the severe illness that followed. (¶51). On May 28, 2021, when Mr. Wood was to return to work on a modified work schedule, still while protected by intermittent FMLA leave, Mr. Bowman terminated Mr. Wood's employment by email. (¶52).

## IV.   Legal Analysis

### A. No Sovereign Immunity in Virginia Code

#### 1. What is a "Political Subdivision"?

BVU is a political subdivision of the Commonwealth of Virginia. As provided in the Virginia Code:

> There is hereby created a ***political subdivision*** of the Commonwealth known as the BVU Authority.

8

> The BVU Authority is created for the express purpose of receiving, by operation of this chapter, the powers, assets, and debts of that ***separately managed and financed*** division of the City of Bristol, Virginia, heretofore known as Bristol Virginia Utilities and to provide the services Bristol Virginia Utilities has provided or may lawfully provide. The General Assembly therefore deems this to be an entity conversion and for all purposes the BVU Authority is the same entity as Bristol Virginia Utilities, which is hereby converted to the BVU Authority. The BVU Authority shall exercise the rights and duties as hereinafter set out to provide the various utility services it currently lawfully provides all subject to the limitations as are herein set forth or referenced.

Va. Code § 15.2-7201. (emphasis added).

The term, "political subdivision" is defined in the Virginia Code:

> The term "political subdivision" shall: (i) as applied to the United States, include any other political subdivision other than states and including without limitation the District of Columbia and the Commonwealth of Puerto Rico; (ii) as applied to other countries, include without limitation states, counties, cities, towns, boroughs, and any division thereof recognized and vested with the authority to enact or promulgate ordinances, rules, and regulations having the force or effect of law; (iii) ***as applied to this Commonwealth and other states of the United States, include without limitation counties, cities, towns, boroughs, and any other division thereof recognized and vested with the authority to enact or promulgate ordinances, rules, and regulations having the force or effect of law***.

9

Va. Code § 8.01-385. (emphasis added).

The Virginia Code also specifically highlights the legal standing of BVU to be sued:

> A. The Authority is hereby granted all powers reasonably necessary or appropriate to carry out the purposes of this chapter in order to provide electric, water, sewer, and telecommunication and related services, including without limitation, cable television internet, and all other services that might be lawfully rendered by use of the Authority's fiber optic system, subject to all applicable limitations and restrictions thereon. ***Such powers include, without limitation***, *except as set forth hereafter, the following:*
>
> . . .
>
> 2. ***To sue and be sued <u>in the Authority's name</u>;***

Va. Code § 15.2-7207. (emphasis added). Notably, this section of the Virginia Code explicitly provides that suits against BVU should list BVU by name as a party and not the Commonwealth of Virginia.

In BVU's brief in support of its motion, BVU contends that the Virginia Code explicitly renders BVU cloaked by sovereign immunity. BVU cites Virginia Code § 15.2-7221, which states:

> No provisions of this chapter nor act of an authority, including the procurement of insurance or self-insurance, shall be deemed a waiver of any sovereign immunity to which the Authority or its directors, officers, employees, or agents are otherwise entitled.

10

Here, the statutory authority states that nothing in the legislation creating the BVU shall serve to limit any sovereign immunity defense that BVU or its officers may elect as a defense in court. The statute creating the BVU does not in any way confer sovereign immunity upon BVU itself, rather the Virginia Code references - - without identifying - - other sources of sovereign immunity that may exist. As discussed below, no independent source of sovereign immunity fits the mold for BVU.

### 2. No Tort Claims Raised

The cases cited by BVU are inapplicable to the instant matter. BVU cites *Chen v. Chesapeake Bay Bridge,* No. CL 19-15, 2021 Va. Cir. LEXIS 106 (Cir. Ct. Feb. 26, 2021) and *Elizabeth River Tunnel Dist. v. Beecher*, 202 Va. 452, 117 S.E.2d 685 (1961) for the notion that sovereign immunity must apply to a defendant such as BVU. However, the matters are distinguishable factually and legally. In *Chen*, the plaintiff raised a claim pursuant to the Virginia Torts Claim Act not any of the federal nor state causes of action raised in the instant matter. The plaintiff in *Elizabeth River* also raised tort claims against a political subdivision. The legal analysis of both cases regard the application of sovereign immunity to **tort claims**. Mr. Wood has notably not raised tort claims.

### 3. Sovereign Immunity and the FMLA: BVU ≠ a State

The FMLA affords up to twelve weeks of unpaid leave to eligible public employees who must, among other requirements, work for a covered employer at a location where the employer has fifty or more employees within seventy-five miles. *See* 29 U.S.C. § 2611(2)(B)(ii). The FMLA incorporates the Fair Labor Standards Act's ("FLSA") definition of "public agency."  Public agencies are covered employers under the FMLA and may include the government of a state ***or a political subdivision of a state***, such as counties, cities, and towns, as well as the agencies of a state or a political subdivision of a state. *See* 29 C.F.R. § 825.108(a). (emphasis added).

BVU contends that Mr. Wood's FMLA counts (I and II) should be dismissed due to the U.S. Supreme Court's ruling in *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30, 132 S. Ct. 1327 (2012).  *Coleman* stands for the proposition that a plaintiff cannot advance a "self-care" FMLA claim against a state government employer.  In *Coleman*, it was unequivocally clear that the plaintiff advanced a case against the State of Maryland.  BVU is not a state government. As defined above, BVU is a political subdivision.

Virginia Code § 8.01-385 specifically defines the term to include "without limitation" counties, cities, towns, etc..  Thus, for purposes of analyzing a question of sovereign immunity, the Court should consider BVU

similarly to a city or county of the Commonwealth of Virginia rather than the Commonwealth itself. Put simply, BVU is not a state. If the Commonwealth of Virginia had intended to place the role of BVU within state-control, it could have enacted legislation to that specific effect. For example, consider legislatively created agencies of the Commonwealth that exercise authority over various public services throughout Virginia such as the Virginia Department of Transportation or the Virginia Department of Corrections. These agencies are true arms of the state and not lesser entities of a more independent nature such as BVU.

Further, Eleventh Amendment immunity does not extend to all "lesser entities" associated with the state; rather it extends only to entities that the Court considers to be "arms" or "instrumentalities" of the state. *Alden v. Maine*, 527 U.S. 706, 756 (1999) ("sovereign immunity . . . bars suits against states but not lesser entities. The immunity does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the state"). BVU is a political subdivision of the Commonwealth of Virginia and thus a lesser entity as contemplated by *Alden*.

### B. Financial Independence of BVU

The U.S. Supreme Court has directed courts to examine the "relationship between the sovereign and the entity in question" and the "essential nature and effect of the proceeding." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997). Varying weight has been given to two factors: the degree of state control over the entity and the state-law classification of the entity. *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 51 (1994).

The only factor singled out as "of considerable importance" is whether the state is "obligated to bear and pay [any potential legal] indebtedness of the [entity]." *Id.* For this reason, *towns, counties and other political subdivisions of the state cannot invoke sovereign immunity in federal courts*, even if they exercise a "slice of state power." *Northern Insurance Co. v. Chatham County*, 547 U.S. 189, 193 (2006). If the facts do not indicate a clear answer, then the "twin purposes of the Eleventh Amendment" determine the question: does granting immunity protect the state's dignity and its treasury? *Hess* at 51. Thus, in *Hess*, when indicators of immunity proved inconclusive, the Court found that the entity was not an arm, based almost exclusively on the entity's "anticipated and actual financial independence". *Id.* at 50.

14

Virginia statutory authority demonstrates that BVU was created to be financially independent. For example, see Virginia Code § 15.2-7213 (regarding depositing BVU funds in "separate accounts"); § 15.2-7214 (granting BVU the authority to "issue bonds . . . for any of its purposes, including the payment of all or any part of the cost of the Authority infrastructure and facilities"); § 15.2-7215 (highlighting the fact that bonds issued by the BVU are "not to be deemed to constitute a debt of the Commonwealth of Virginia"). Mr. Wood notes that a true examination of BVU's "financial independence" , as permitted by the discovery process, may be warranted to understand this issue fully.

Should sovereign immunity apply to Mr. Wood's FMLA claims, then the effect would be that Mr. Wood would be barred from claiming monetary damages.  However, the bar would have no effect on the Court's ability to award an equitable remedy such as an injunction which has been requested within the *ad damnum* clause of this matter.

### D. Sovereign Immunity and Mr. Wood's Remaining Counts

BVU does not specifically contend that it is immune from Mr. Wood's ADA claims nor his state law claims.  Presumably like BVU, Mr. Wood is unable to highlight case law indicating that BVU is immune from these claims, but should the Court reason otherwise, Mr. Wood would request

15

leave to file additional briefing and/or amend his complaint such that the claims are sufficiently pleaded.

## CONCLUSION

For the reasons stated above, BVU's motion to dismiss pursuant to Rule 12(b)(1) should be denied.

Respectfully submitted,

**JAMES WOOD**

By /s Thomas E. Strelka

Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
Brittany M. Haddox, Esq. (VSB # 86416)
Monica L. Mroz, Esq. (VSB #65766)
STRELKA EMPLOYMENT LAW
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330
Roanoke, VA  24011
Tel:  540-283-0802
brittany@strelkalaw.com
thomas@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com
monica@strelkalaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

On the 29th day of July, 2022, the undersigned counsel for Mr. Wood filed this mater on the Court's CM/ECF filing system which transmitted a Notice of Electronic Filing to:

Jennifer D. Royer, Esq. (VSB # 68099)
ROYER LAW FIRM, P.C.
PO Box 4525
Roanoke, Virginia 24015
540.788.2892  Telephone
540.675.4093  Facsimile
jroyer@royerlawfirm.com
Counsel for Defendant

/s/ Thomas E. Strelka