IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| JAMES WOOD, | ) |
| | ) |
|       *Plaintiff*, | ) |
| | ) |
| v. | )   Case No. 1:22CV00018 |
| | ) |
| BRISTOL VIRGINIA UTILITY | ) |
| AUTHORITY, | ) |
| | ) |
|       *Defendant*. | ) |

**DEFENDANT'S RESPONSE TO COURT ORDER REGARDING MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

Defendant, BVU Authority, incorrectly sued herein as Bristol Virginia Utility Authority, by counsel, submits this response to this Court's Opinion and Order entered August 29, 2022.

STATEMENT OF FACTS RELEVANT TO BVUA'S IMMUNITY

BVUA was formed in 2010 by acts of the Virginia General Assembly. *See* Declaration of Donald Bowman, attached as Exhibit A. Prior to 2010, BVUA was referred to as the Bristol Virginia Utilities Board (BVUB). BVUB was formed as in the mid 1950's when the City of Bristol merged the day-to-day operation of its water, sewer, and newly purchased electric distribution system from the Tennessee Valley Authority ("TVA") into a consolidated operation.

1

After July 1, 2010, BVUA was subject to the control of the General Assembly, which legislatively granted the BVU Authority "the rights and duties as hereinafter set out to provide the various utility services it currently provides all subject to the limitations as are herein set forth or referenced." Va. Code § 15.2-7201.

In 2016, in the face of an extensive federal and state criminal investigation of BVUA, which resulted in criminal convictions for two contractors, three former board members, and four employees, the Virginia General Assembly amended the BVU Authority Act to impose comprehensive controls over the operation of the agency. The 2016 amendments placed additional state control over BVUA including in the areas of governance, territorial limits, legal counsel, mandatory training, limits on executive compensation, procurement, scope of business operations, employment and management of personnel, and even ordering an audit by the Auditor of Public Accounts (APA). The audit resulted in 57 recommendations for oversight of the BVUA. In 2017, the Virginia General Assembly again passed additional legislation – this time to assist BVUA with the sale of its internet, phone, and cable business.

Additional facts with greater specificity are set forth in the Declaration of Donald Bowman, which is attached. To avoid redundancy, Mr. Bowman's declaration is incorporated into this Statement of Facts.

ARGUMENT

I.     STANDARD OF REVIEW

Eleventh Amendment immunity extends to state agents and instrumentalities, otherwise known as "arm[s] of the state." *Cash v. Granville Ctny. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir. 2001). In determining whether an entity is an arm of the state and entitled to immunity, courts consider four factors: (1) whether a judgment against the entity would be paid from the state's treasury; (2) the degree of control the State exercises over the entity or the degree of autonomy from the State that the entity enjoys; (3) the scope of the entity's concerns – whether local or statewide – with which the entity is involved; and (4) the manner in which the State law treats the entity. *Id*. at 223-24.

In *Workman v. Mingo County Schools*, the district court examined the issue of whether an entity (a local school board) that might not otherwise be considered eligible for Eleventh Amendment immunity was an arm of the state that should be entitled to immunity after the state intervened in the operations of the Board's system, limiting the power of the Board. 667 F. Supp. 2d 679 (S.D. W. Va. 2009). In finding that the state effectively took control over the school system by (1) limiting the authority of the Board as to the expenditure of its funds, the employment and dismissal of personnel, the establishment and operation of the school calendar, instructional programs, and rules; (2) declaring the office of the superintendent vacant; (3) delegating to the state the authority to fill positions of

administrators with individuals deemed by the state to the be most qualified for the positions, the district court deemed the Board to be an arm of the state.

The state intervened in the operation of the school system "to cause improvements to be made that will provide assurances that a thorough and efficient system of schools will be provided." *Id*. at 686.

Under the facts of this case, the state effectively took control of the operations of BVUA in the face of unprecedented conduct by members of BVUA's Board, contractors, and employees that led to nine criminal convictions. The state, through legislation adopted by the General Assembly, (1) removed the sitting Board, (2) replaced the Board with members of its choice, (3) set qualifications and restrictions for those members, (4) eliminated the Board's ability to make changes to its own composition, (5) controlled which Board members could cast votes on certain issues before the Board, (6) prohibited the Board from receiving compensation or making donations of BVUA funds, (7) eliminated the Board's ability to hire and supervise Authority personnel, (8) set limits on the Board's ability to contract with a President and General Counsel, (9) gave training directives to its General Counsel, (10) restricted the scope and types of its business enterprises, (11) imposed specific territorial restrictions on the Board's operations, and (12) imposed purchasing and procurement rules on the Board, among other controls.

The General Assembly also intervened on behalf of BVUA with new legislation to assist it in closing the sale of its internet, phone, and cable division when its proposed sale hit an obstacle because of the procurement rules imposed on BVUA.

While BVUA does not receive direct line-item appropriations of its funds from the Commonwealth, BVUA does have the authority to borrow from VRA funds, and in the event of a default on a VRA loan, the Commonwealth would be liable to its lenders.

Because the state's control over BVUA is deep and comprehensive, the evidence supports finding that BVUA is an arm of the state for the purposes of Eleventh Amendment immunity.

II.  A JUDGMENT AGAINST DEFENDANT WOULD NOT BE PAID FROM THE COMMONWEALTH'S TREASURY.

The first *Cash* factor for the Court's consideration is whether a judgment against BVU would be paid from the Commonwealth of Virginia's treasury. A judgment against BVUA would not be paid from the state's treasury; however, the present case alleges a relationship with the Commonwealth that is different than *Cash* and thus requires a different analysis.

BVUA is authorized to issue debt or receive loans, including loans from the Virginia Resource Authority ("VRA").  The VRA is a political subdivision of Virginia. *See* Va. Code §62.1-200.  It has the power to borrow money and issue

bonds.  *See* Va. Code §62.1-204.  BVUA has the authority to borrow money from the VRA.  While the VRA requires certain covenants for repayment in the borrower's name, in the event of a default by the borrower, VRA is ultimately "on the hook" to repay the debt to third parties while it works to recover funds from the borrower.  In the event of nonpayment of a VRA loan, the Governor of Virginia can order the Comptroller to withhold payment of all other funds from the Commonwealth to the defaulting entity until the funds are repaid.  *See* Va. Code §62.1-216.1.

III.  THE COMMONWEALTH EXERCISES A COMPREHENSIVE LEVEL OF CONTROL OVER BVUA.

The second *Cash* factor for the court to consider is the amount of control the Commonwealth of Virginia exercises over BVUA or the degree of autonomy from the Commonwealth that BVUA has.  If the state exercises an extensive degree of control, then the entity may still be entitled to immunity under the Eleventh Amendment even if the Treasury factor is not met.  *Cash*, 242 F.3d at 224.  The Declaration of Donald Bowman is replete with examples of state control over BVUA that are supported with exhibits such as the Final Report of the Auditor of Public Accounts, the appointment letters for the members of the Board, the Fiscal Impact statement showing that the Commonwealth appropriated funds for the payment of the BVUA audit, and the enrollment agreement between BVUA and

the Commonwealths' Department of Human Resource Management for participation in the state's benefits' program for BVUA employees.

In short, in the wake of nine criminal convictions and major financial concerns, the General Assembly exercised its authority and rewrote the BVUA Act to control all major areas of BVUA's financial and operational management.

For example, the General Assembly removed each incumbent board member and replaced them with new board members that met qualification criteria that the General Assembly set. The General Assembly also directly appoints two members of the Board. Va. Code § 15.2-7205. The General Assembly also prohibited BVUA board members from being paid. Va. Code §15.2-7206.9.

The General Assembly also imposed restrictions on the Board's ability to hire and supervise employees and contractors. Va. Code §§ 15.2-7206.6, -7206.7. Such restrictions do not exist for county or municipal governments.

To address past abuse the General Assembly specifically mandates that the BVUA Board adopt a travel and expense policy that applies to Board members and Authority employees and addresses what expenditures are appropriate in furtherance of the activities of the Authority, adopt a conflict-of-interest policy addressing the acceptance by Board members or Authority employees of gifts of travel or entertainment from any vendor that seeks or maintains a contract with the

Authority, and file financial disclosure forms with the president, disclosing economic interests.  Va. Codes §§15.2-7206.10 – 7206.12.

The General Assembly also controls the issues on which Board members may cast votes.  Va. Code §15.2-7206(E) ("Notwithstanding the quorum requirement in subsection A, any decision of the Board related to the provision, use, operation, or maintenance of water or sewer systems shall be made by a majority vote of the three members of the Board representing the City of Bristol, Virginia, and the director who is a member of the Washington County Board of Supervisors.")

The General Assembly also controls specific aspects of the Board's ability to contract with the Authority's President, including contract length, severance payout, and restricting the ability to enter into employment contracts with employees.  Va. Code §15.7206(B).

The General Assembly also crafted specific limits on the appointment of BVUA's general counsel, controlling how BVUA appoints its general counsel, limiting general counsel's ability to work for the City of Bristol or Washington County, and directing the general counsel to conduct annual training with the board.  Va. Code 15.2-7206(C).

The General Assembly restricted BVUA's business reach, prohibiting it from seeking to become or establish a wireless service authority under the Virginia

Wireless Service Authorities Act (§15.2-5431.1 et seq.) or contract for services with such an authority. Va. Code §15.2-7207(D).

The General Assembly imposed limits on BVUA's procurement authority, including its ability to engage in procurement in other states. Va. Code §15.2-7212. Notably, when the Auditor of Public Accounts was making its recommendations with respect to BVUA's contracts, it stated that BVUA should be using language in its contracts that would allow it to terminate a contract with a vendor without penalty in the best interest of the *Commonwealth* – not in the best interest of the Authority, but in the best interest of the Commonwealth. Decl. Ex. 1, p.49.

The General Assembly also intervened on BVUA's behalf when BVUA was attempting to sell its internet, phone, and cable divisions. As the deal dragged on, a key issue became whether BVUA could continue to buy telecom services from Sunset in view of the procurement restrictions imposed on BVUA by the General Assembly under the BVU Act. To aid in closing the transaction, in 2018 a local delegate became aware of the issue and drafted legislation that was assigned the number House Bill 1450. HB1450 (codified at Virginia Code § 15.2-7207.15) authorized BVUA to purchase telecom services from Sunset for a period of four years. Through this legislation, the General Assembly intervened on behalf of BVUA, granting it express authority to assist BVUA in closing this transaction.

The state legislature treats BVUA as an arm of the state by exercising extensive state control through legislation. As such, the second *Cash* factor is amply met under these circumstances.

IV.   **BVUA IS CONCERNED WITH REGIONAL CONCERNS, NOT JUST LOCAL CONCERNS.**

The third *Cash* actor is whether the entity is concerned with local or statewide concerns. *Cash*, 242 F.3d at 224. While BVUA has business interests that could open it to the statewide marketplace, the General Assembly provided specific territorial restrictions on BVUA under the 2016 amendment to the BVUA Act. Va. Code §15.2-7207. Under the Act, BVUA is authorized to operate in Virginia and Tennessee, and the type of services it provides depends upon the jurisdictions within those states. BVUA serves multiple localities and is involved in operations in two states. While not state-wide in activities, BVUA provides regional services. It is not limited to local concerns of a locality.

V.   **THE COMMONWEALTH TREATS BVUA AS ITS OWN CREATION.**

The fourth *Cash* factor is how the Commonwealth characterizes BVUA. *Cash,* 242 F.3d at 226. This analysis overlaps with the above analysis of state control versus local autonomy. The numerous reforms and restrictions that the Commonwealth placed on BVUA both in the legislation creating BVUA in 2010 and the substantial reforms of 2016, demonstrate that BVUA is not treated as a locality.

The BVUA Act specifically prohibits BVUA from waiving sovereign immunity.  Virginia Code §15.2-7221 states, "No provision of this chapter nor act of an authority, including the procurement of insurance or self-insurance, shall be deemed a waiver of any sovereign immunity to which the Authority or its directors, officers, employees, or agents are otherwise entitled."  Other localities may, by contract or otherwise, waive their own immunity.  The General Assembly, in an act of protectionism, prohibited BVUA from waiving its immunity or that of its directors, officers, employees, or agents.

Further, BVUA employees are treated like state employees for the purpose of benefits to which they are entitled.  BVUA employees receive state benefits.  Employees of localities do not.

Because the Commonwealth treats BVUA as a state agency, this Court should do so as well.

## CONCLUSION

For the foregoing reasons, defendant BVU Authority, by counsel, requests that Counts 1 and 2 related to the FMLA self-care provisions be dismissed with prejudice for lack of subject matter jurisdiction and for such other and further relief that this Court deems appropriate.

Respectfully submitted,

BVU AUTHORITY (incorrectly sued herein as BRISTOL VIRGINIA UTILITY AUTHORITY)

/s/  Jennifer D. Royer
Of Counsel

Jennifer D. Royer, Esq. (VSB # 68099)
ROYER LAW FIRM, P.C.
PO Box 4525
Roanoke, Virginia 24015
540.788.2892  Telephone
540.675.4093  Facsimile
jroyer@royerlawfirm.com
Counsel for Defendant

CERTIFICATE

I hereby certify that on the 12th day of September 2022, I have electronically filed this document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Thomas E. Strelka, Esq.
L. Leigh R. Strelka, Esq.
N. Winston West, Esq.
STRELKA EMPLOYMENT LAW
119 Norfolk Avenue, SW, Suite 330
Roanoke, Virginia 24011

/s/  Jennifer D. Royer
Jennifer D. Royer, Esq. (VSB # 68099)
ROYER LAW FIRM, P.C.
PO Box 4525
Roanoke, Virginia 24015
540.788.2892Telephone
540.675.4093  Facsimile
jroyer@royerlawfirm.com
Counsel for Defendant